# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CREST RESOURCES, INC., an Oklahoma corporation, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 09-CV-766-TCK-PJC<br>) |
| DAN BLOCKER PETROLEUM CONSULTANTS, INC., a Texas corporation; and WEATHERFORD INTERNATIONAL, INC., a Delaware corporation, | )<br>)<br>)<br>)<br>) |
| Defendants; | )<br>) |
| -and- | )<br>) |
| WEATHERFORD INTERNATIONAL, INC., a Delaware Corporation, | )<br>)<br>) |
| Third-Party Plaintiff, | )<br>) |
| v. | )<br>) |
| HEXION SPECIALTY CHEMICALS, INC., | )<br>) |
| Third-Party Defendant. | ) |

## OPINION AND ORDER

Before the Court is Defendant Weatherford International, Inc.'s Motion for Summary Judgment (Doc. 61).

## I. Factual Background

Plaintiff Crest Resources, Inc. ("Crest"), an Oklahoma corporation, owns oil and gas leases and is the operator of the Morris 2H well ("Morris 2 Well") located in Red River County, Texas. Crest contracted with Defendant Dan Blocker Petroleum Consultants, Inc. ("Blocker") "to supervise all field operations and to execute what needed to be done at the [Morris 2 Well]." (Weatherford's

Mot. for Summ. J., at Undisputed Fact 2.) Crest also "collaborated with [Blocker] with respect to the design of the [Morris 2 Well] and its completion." (*Id.*, Undisputed Fact 3.) With regard to completion of the Morris 2 Well, Crest primarily consulted with Blocker employee Danny Brooks ("Brooks").

On behalf of Crest, Brooks solicited bids for completion of a fracture stimulation job ("frac job") on the Morris 2 Well.[1] On or around March 2, 2009, Defendant Weatherford International, Inc. ("Weatherford") submitted to Brooks a "Stimulation Recommendation," which contains the following cover page:

Crest Resources

Jon Morris #2H
Packer Plus
Red River County, Texas

Stimulation Recommendation

. . .

| Prepared For | Mr. Danny Brooks | Prepared By | Matt Cohee |
| --- | --- | --- | --- |
| . . . | | . . . | |
| | | Prepared By | Paul Newman |
| . . . | | . . . | |

3/2/2009
Recommendation Version:3[2]

---

[1] "Frac job" is the shorthand phrase used by the parties for the fracture stimulation procedure at issue.

[2] The two prior versions of the recommendation were first presented in Weatherford's reply brief. As explained in more detail *infra* note 5, the Court declines to consider any evidence or arguments first presented in Weatherford's reply brief.

(Ex. 1 to Crest's Resp. to Weatherford's Mot. for Summ. J (footnote added).) On or around March 2, 2009, Glenn Hudgens ("Hudgens"), of Crest, "signed off on the Weatherford job proposal" after Brooks presented it to him. (Crest's Mot. for Summ. J., Undisputed Fact 6-8.) Brooks informed Weatherford employee John Paul Newman ("Newman") that Weatherford would perform the frac job.

On or around March 5, 2009, Weatherford performed the frac job at the Morris 2 Well, including providing certain materials. Brooks was present at the site while Weatherford performed the frac job. On March 5, 2009, Brooks signed a Weatherford-generated document entitled "Field Estimate" ("Field Estimate"), which identifies Crest as the "bill to" party. In printed type, the Field Estimate sets forth item numbers, quantities, prices, and a "field estimate total" of $224,911.97. Certain quantities and prices are crossed through and interlineated with hand-written changes, including the field estimate total, which is hand-written as $225,919.77. The Field Estimate is signed by a Weatherford representative and Brooks.

In small print above the signature lines, the Field Estimate contains the following language:

> Weatherford . . . will provide the requested equipment, materials or services to its customer. Such provision shall be governed by the terms and conditions of the applicable master service agreement between the parties. In the event that there is no such standard service agreement,[3] Weatherford's standard terms and conditions, a copy of which can be found at www.weatherford.com/t&c shall be applicable to the provision of such equipment, materials or service. (A paper copy of these standard terms and conditions will be provided to you upon written request.) This price is good for 30 days unless otherwise noted.

---

[3] It is undisputed that there is no applicable standard service agreement between Crest and Weatherford.

(Ex. 3 to Weatherford's Mot. for Summ. J.) The web address referenced in the Field Estimate is to a document entitled "Terms and Conditions of Sale, Rental and Service, and Fishing Tool Rental" ("Terms and Conditions"). The introductory section of the Terms and Conditions provides:

> (A) General: These Terms and Conditions constitute the entire contract (the "Contract") between the parties and may not be amended except in writing by Weatherford's authorized representative.
> . . .
> (C) No consequential damages: Weatherford will not be responsible for incidental or consequential damages of any kind, which shall include but not be limited to, loss of revenue, profits or anticipated profits, loss of business opportunity, loss of production, damages for failure to meet deadlines, loss of use, rig time expenses, well control expenses, subsurface damage, loss of hole, re-drilling expenses, reservoir or formation damage, pollution damage and/or wreck or debris removal expense ("Consequential Damages").

(Ex. 5 to Weatherford's Mot. for Summ. J. at 2.) Under the heading "Sales Terms," the document provides:

> 1. LIMITED WARRANTY/DISCLAIMER: (A) Provided that Customer subjects Equipment only to operating conditions specified by Customer when the order is placed, if any, and operates it in accordance with Weatherford's written operating instructions, if any, Weatherford warrants Equipment sold pursuant hereto to be free of defects in material and workmanship for a period of 1 year after the date Equipment is delivered. . . . (B) Weatherford's liability for breach of this warranty is expressly limited to the repair or replacement, at its sole option, of any Equipment or parts of Equipment which prove to be defective during the warranty period. All parts repaired or replaced hereunder shall be repaired or replaced F.O.B. Weatherford's Plant (i.e. location from which Equipment is shipped.) (C) Weatherford's obligation to repair or replace constitutes agreed and liquidated damages for any breach of Weatherford's warranty. This limited express warranty, and the stated remedies for breach thereof, shall be in lieu of any and all other warranties, express or implied, including without limitation, warranties for merchantability or fitness for any particular purpose, and in lieu of liability for Weatherford's negligence or fault. Weatherford will not be responsible for incidental or consequential damages of any kind.

(*Id.* at 3-4.)  Both the "Sales Terms" and the "Rental and Service Terms" sections also contain an indemnity provision requiring the customer to defend, indemnify, release, and hold Weatherford harmless for certain types of harm.  (*See id.* at 5, 8-9.)  The "Rental and Service Terms" indemnity provision excepts the indemnity requirements "where the damage, injury or death was caused by the sole negligence of Weatherford."  (*Id.* at 9.)

In its Complaint filed in December 2009, Crest alleges that the Morris 2 Well is irreparably damaged and must be re-drilled.  Crest asserts four causes of action against Weatherford and two against Blocker: (1) Weatherford supplied and used defective stimulation fluids and flow back fluids while performing the frac job and is liable for Crest's damages under theories of defective product/manufacturer product liability; (2) by selling defective products and using them on the Morris 2 Well, Weatherford breached an implied warranty of merchantability; (3) Weatherford was negligent in its design, implementation, and supervision of the frac job, and, as a direct result of such negligence, "Plaintiff incurred damages because the Well has been improperly fracture treated and completed, and the [Morris 2 Well] cannot be repaired," (Compl. ¶ 38); (4) Blocker breached its contract with Crest "by failing to provide prudent engineering and competent expertise in designing and implementing fracture stimulation of the well and in failing to provide . . . competent personnel to fracture stimulate and complete the well," (*id.* ¶ 40); (5) Blocker was negligent in performing certain "cleanouts" with fresh water, and, as a direct result of such negligence, Crest incurred damages and lost substantial production from the Morris 2 Well; and (6) Crest is entitled to declaratory judgment that it does not owe Weatherford the invoiced amount of $230,968.28 for the materials and services provided in connection with the frac job.

Weatherford filed a counterclaim against Crest for the payment of unpaid invoices for the frac job totaling $230,968.28. Weatherford also filed a third-party complaint against Hexion Speciality Chemicals, Inc. ("Hexion"), alleging that Hexion was the designer and manufacturer of the allegedly defective product used during the frac job and seeking indemnity and/or contribution for any sums for which Weatherford is held liable.

On July 14, 2011, Weatherford filed the motion for summary judgment pending before the Court.[4] Weatherford moved for summary judgment as to all claims, or, alternatively for a summary declaration that Crest is precluded from recovering any incidental or consequential damages. Weatherford contends that: (1) the Terms and Conditions are part of the parties' contract, and they preclude and/or limit liability for the product liability and negligence claims asserted against it; and (2) Crest's claim for breach of implied warranty of merchantability is not cognizable because (a) the UCC's warranty provisions do not apply, and (b) the Terms and Conditions disclaim any implied warranties. Weatherford's position is that the Field Estimate is the contract, the Field Estimate incorporates the Terms and Conditions, and Brooks had actual and apparent authority to sign the Field Estimate on behalf of Crest. Weatherford's alternative position, asserted for the first time in its reply brief, is that, assuming the contract governing the frac job did not contain the Terms and Conditions, the Terms and Conditions are nonetheless enforceable based on Crest and Weatherford's prior course of dealing.[5]

---

[4] The summary judgment deadline has been extended, and all dispositive motions are currently due May 14, 2012.

[5] Crest did not move to file a surreply responding to this new evidence, nor did the Court sua sponte permit a reply brief. Under these circumstances, and because there is no reason the course of dealing argument and supporting evidence could not have been part of the original motion, the Court declines to consider any new arguments and evidence submitted as part of the

6

Crest argues that (1) a contract was formed when it accepted the offer set forth in the Stimulation Recommendation; (2) Brooks did not have actual or apparent authority to modify the contract to include the Terms and Conditions set forth in the Field Estimate; (3) assuming the Terms and Conditions are part of the contract, they are unenforceable because they do not satisfy the requisite fair notice" requirements; and (4) assuming the Terms and Conditions are part of the contract, they do not limit liability in this case.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

---

reply brief. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003) (indicating that when new evidence or arguments are presented in a reply brief, the district court must either disregard the reply or allow the opposing party to file a surreply); *Martinez v. Blake's Lotaburger LLC*, 674 F. Supp. 2d 1286, 1287 (D.N.M. 2009) (same).

## III. Product Liability and Negligence

Weatherford relies upon the Terms and Conditions to escape or limit liability for the product liability and negligence claims. For purposes of this motion only, the Court assumes without deciding that the Field Estimate constitutes the contract between the parties and that the Terms and Conditions are incorporated by reference therein.[6] However, the Court concludes that Weatherford is not entitled to summary judgment because it has not demonstrated as a matter of law that (1) Brooks had actual or apparent authority to bind Crest to the Terms and Conditions, or (2) Crest ratified the Terms and Conditions.

### A. Actual or Apparent Authority

"A principal is liable for the acts of its agent only when the agent has actual or apparent authority to perform those acts or when the principal ratifies the agent's conduct." *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 920 (Tex. App. 2011).[7] "Actual authority refers to responsibility a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *Id.* at 921. "In determining whether an agent had actual authority to act for his principal, we examine the principal's words and conduct relative to the agent." *Id.* "A finding of actual authority cannot be based merely on the words or deeds of the agent." *Id.*

"Actual authority may be expressed and implied." *Id.* "Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series

---

[6] The Court elects to dispose of Weatherford's motion without passing upon questions regarding contract formation. If necessary, such issues may be addressed as a matter of law at other stages of these proceedings.

[7] The parties agree that Texas law applies to the dispute.

of acts on behalf of the principal." *Id.* "Implied authority is the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers." Therefore, implied agency "exists only as an adjunct to express actual authority," and "an agent who does not have express authority cannot have implied authority." *Id.*

"Apparent authority is the power of an agent to affect the legal relations of the principal by transactions with a third party." *Id.* at 924. "Apparent authority is based on estoppel, and only the conduct of the principal in leading a third party to believe that the agent has authority may be considered." Id. "[T]he reviewing court looks to 'acts of participation, knowledge, or acquiescence by the principal.'" *Id.* at 925 (quoting *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex.1998)). "Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Id.* "The applicable standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority," and "a party seeking to recover under an apparent-authority theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party." *Id.*

In *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 920 (Tex. App. 2011), a Texas Court of Appeals recently addressed strikingly similar agency questions to those presented here. In that case, the operator of an oil and gas lease ("operator") hired a consultant to design, manage, and supervise a drilling project on the lease. An employee of the consultant, Roy Judd ("Judd"), worked at the well site as the "company man." In such capacity, Judd "frequently requested services and equipment from contractors and signed hundreds of job tickets pertaining to

9

these services." *Id.* at 918. Consistent with this practice, Judd contacted Expro Americas, LLC ("contractor") to request the performance of "choke flow services." Following provision of the services, the contractor presented Judd with a job ticket to sign. The reverse side of the ticket was entitled "Rental and Service Agreement Terms and Conditions" and contained eight separate provisions, including a release and indemnity provision whereby the parties agreed to indemnify each other and procure insurance covering their respective indemnity obligations. When the contractor was named as a defendant in a lawsuit, it demanded defense and indemnity from the operator. On cross motions for summary judgment, the trial court granted the operator's motion without discussion and denied the contractor's motion, thereby holding that Judd lacked authority as a matter of law to bind the operator to the relevant provisions.

The appellate court reversed, reasoning that neither party was entitled to summary judgment and that a question of fact existed as to whether Judd had actual or apparent authority to bind the operator. The contractor presented evidence that: (1) Judd signed over a thousand job tickets; (2) Judd requested the contractor's services; (3) Judd knew there was writing on the reverse side of the ticket but did not read it; (4) the ticket contained a provision stating that Judd was authorized to sign the agreement as the operator's agent; (5) Judd had signed prior job tickets containing similar language; (5) the operator received the job ticket and paid it without objection; and (6) it was industry standard for job tickets to contain indemnity provisions, and an operator should be aware of this. The operator presented evidence that: (1) the purpose of signing job tickets at the well site is to confirm that equipment and services have been provided; (2) the operator had never told Judd he had authority to sign release, indemnity, or hold harmless language, although he did have authority to determine and request necessary services for the project; and (3) neither Judd nor the contractor's representative

10

were aware of the provisions on the reverse side of the ticket. Under these circumstances, the court reasoned that neither party was entitled to summary judgment on the agency question. *Id.* at 924-27.

Applying *Expros Americas* to the facts presented, Weatherford has not established Brooks' actual authority to bind Crest to the Terms and Conditions as a matter of law. In support of its actual authority argument, Weatherford submitted the following testimony of Hudgens:

> A [Hudgens] Typically, there's a ticket after the job that would be submitted and asked for signature.
> Q And those documents presented for signature at the well site are signed by someone from Blocker on behalf of Crest; is that correct for me to understand it that way?
> A That would be a fair statement.
> . . .
> Q Okay. If this is the kind of document that would have been presented to Danny Brooks to sign at the start of the job on March 5th, this would be the kind of job he would be signing in his role as your consultant in the field?
> A That's correct.
> Q And he would have done that with your authority?
> A With his authority to sign a ticket for delivery of product, yes.

(Hudgens Dep., Ex. 1 to Weatherford's Mot. for Summ. J., at 63:14-20; 101:10-18.) Hudgens also submitted an affidavit stating:

> Dan Blocker was not authorized to agree to Weatherford's Terms and Conditions and was not authorized to agree to any limitation of liability on behalf of Crest. Dan Blocker was authorized only to sign field tickets on behalf of Crest to confirm that the costs were as agreed upon in the March 2, 2009 Contract with Weatherford.

(Hudgens Aff., Ex. 5 to Crest's Resp. to Weatherford's Mot. for Summ. J.)

The deposition testimony relied upon by Weatherford establishes that Brooks had authority to affirm that Weatherford had delivered the product and service, but it does not establish that Brooks had express or implied authority to bind Crest to the Terms and Conditions. Weatherford equates Brooks' express authority to sign the Field Estimate with express or implied authority to enter into any terms and conditions contained thereon. However, Texas law requires a more nuanced factual

11

inquiry – namely, whether Brooks had express or implied authority to enter into the specific Terms and Conditions referenced in the Field Estimate. *See Expros Americas*, 351 S.W.2d at 922 (alleged agent's express authority to sign "job ticket" did not result in agent's authority to enter into terms and conditions on reverse side of job ticket as a matter of law). This inquiry requires consideration of numerous facts and circumstances upon which the current record is silent. *See id.* (discussing alleged agent and contractor's awareness of the terms on reverse side of ticket; operator's instructions to alleged agent's employer; whether agreement to the particular provisions at issue were a "necessary and proper facet" of agent's responsibilities; and the extent and nature of the terms agreed to, *i.e.*, that they resulted in a "major risk-allocation decision" for the operator ). Given the numerous other circumstances that must be considered and Hudgens's affidavit denying that Brooks had authority to agree to the Terms and Conditions, Weatherford is not entitled to summary adjudication on the question of actual express or implied authority.

With respect to apparent authority, the inquiry is whether Weatherford reasonably believed Brooks had authority to enter into the Terms and Conditions on behalf of Crest. Weatherford's second statement of fact, which is undisputed, is the only evidence in Weatherford's motion that potentially relates to this issue. Such undisputed fact is that "[Crest] hired [Blocker] to supervise all field operations and to execute what needed to be done at the well." (Weatherford's Mot. for Summ. J. ¶ 2.) First, this fact does not specifically establish Weatherford's belief or knowledge about Blocker and/or Brooks' authority. It merely establishes Blocker and/or Brooks' title and general authority.

Second, assuming the above-stated fact was sufficient to create an inference that Weatherford was aware of Blocker and/or Brooks' authority to supervise all field operations, this also does not

entitle Weatherford to summary judgment on the apparent authority question. Under Texas law, apparent authority based on an agent's title or position exists "'only as to those things ordinarily entrusted to one occupying such a position.'" *See Expros Americas*, 351 S.W.2d at 926 (quoting *Rourke v. Garza*, 530 S.W.2d 794, 804 (Tex. 1975)). The Terms and Conditions at issue include risk-shifting provisions that have a significant financial impact on the parties. Such terms include liability limitations, which Weatherford seeks to enforce in this litigation, as well as indemnity provisions. Weatherford has failed to present evidence establishing that agreeing to the Terms and Conditions was a duty "ordinarily entrusted" to one occupying Brooks' position. Brooks' authority to supervise field operations, which is indeed undisputed, may or may not encompass apparent authority to bind Crest to the Terms and Conditions, and such question requires analysis of many other facts. *See, e.g., id.* at 926-27 (finding fact issue regarding apparent authority to bind operator to indemnity provision on reverse side of job ticket where (1) alleged agent was the "company man"; (2) evidence showed that company men were generally responsible for signing job tickets; (3) company man was responsible for requesting services and was principal contact person between the contractor and the operator; and (4) contractor required company man, and not a lower ranking representative, to sign the job ticket); *Rourke*, 530 S.W.2d at 804 (reversing jury's finding of apparent authority of "general superintendent" to bind operator to indemnity provision on reverse side of job ticket where (1) operator became aware of provisions after job ticket was signed; (2) superintendent did not request contractor's services; (3) neither superintendent or contractor's representative were aware of the terms; and (4) contractor would have permitted job ticket to be signed by any operator representative at the job site rather than requiring superintendent to sign it). Therefore, Weatherford is not entitled to summary adjudication on the issue of apparent authority.

### B. Ratification

"Ratification occurs when a party recognizes the validity of a contract by acting under it, performing under it or affirmatively acknowledging it." *Zieben v. Platt*, 786 S.W.2d 797, 802 (Tex. App. 1990). Again, the Court concludes that Weatherford has not presented sufficient evidence to establish ratification as a matter of law. Weatherford relies upon the same facts explained above – namely, Brooks' authority to sign the Field Estimate – in support of its ratification argument. (*See* Weatherford's Mot. for Summ. J. 10 ("Plaintiff knew the job was being done at the time it was being done and thus allowed the job to go forward knowing [Brooks] would sign a field ticket on its behalf and with its authority.").) However, ratification turns on Crest's actions after it became aware of the Terms and Conditions, and there is no such evidence presented in Weatherford's motion. Further, Weatherford has filed a counterclaim seeking payment for the services in the Field Estimate, indicating that Crest has not ratified the Terms and Conditions by paying for the frac job. Therefore, Weatherford is not entitled to summary adjudication on the ratification issue.

### IV. Breach of Implied Warranty of Merchantability

Weatherford argues that Crest's claim for breach of implied warranty of merchantability is not cognizable because (a) the UCC's warranty provisions, which are necessary to support this claim, do not apply, and (b) the Terms and Conditions disclaim any implied warranties. Crest did not respond to either argument or present any contrary evidence. Based on the authority and arguments presented by Weatherford regarding the UCC's lack of applicability, which are deemed confessed, the Court finds that Weatherford is entitled to summary adjudication on this claim. Accordingly, the Court grants Weatherford's motion for summary judgment on the breach of implied warranty of merchantability claim.

## V. Conclusion

Defendant Weatherford International, Inc.'s Motion for Summary Judgment (Doc. 61) is GRANTED IN PART and DENIED IN PART. It is granted as to Crest's claim for breach of the implied warranty of merchantability and denied in all respects as to the negligence and product liability claims.

SO ORDERED this 29th day of March, 2012.

_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**