# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CREST RESOURCES, INC., an Oklahoma corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 09-CV-766-TCK-PJC |
| DAN BLOCKER PETROLEUM CONSULTANTS, INC., a Texas corporation, and WEATHERFORD INTERNATIONAL, INC., a Delaware corporation, | ) ) ) ) ) |
| Defendants; | ) ) |
| -and- | ) ) |
| WEATHERFORD INTERNATIONAL, INC., a Delaware Corporation, | ) ) ) |
| Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| HEXION SPECIALTY CHEMICALS, INC., | ) ) |
| Third-Party Defendant. | ) |

## OPINION AND ORDER

Before the Court is Third-Party Defendant Hexion Specialty Chemical's Motion for Summary Judgment Against Third-Party Plaintiff Weatherford International, Inc. (Doc. 113), which the Court took under advisement following the pretrial conference. Also before the Court are Defendants' motions, made orally during the pretrial conference, to preclude Mr. Glenn Hudgens from offering any expert opinion testimony.

**I.      Factual Background**

The factual background is set forth in the Court's Order dated March 7, 2014 (Doc. 178) and is incorporated herein by reference.

**II.     Hexion's Motion for Summary Judgment Against Weatherford**

In its Third-Party Complaint, Weatherford asserts a claim for "indemnity and/or contribution" against Hexion:

> Weatherford files this Third-Party Complaint *seeking indemnity and/or contribution* from Hexion because on December 8, 2009, plaintiff herein initiated the instant action alleging, among other things, that *Weatherford had sold plaintiff a defective product used in fracturing a well owned and operated by plaintiff. The product in question was designed and manufactured by Hexion, and is a resin coated sand which is injected into hydrocarbon formations to aid in the completion and production phases of oil and gas wells.*[1]
> . . .
> Weatherford denies it was guilty of any negligence or strict liability contributing to or
> independently causing the harm complained of by plaintiff. However, in the event a finding of liability against Weatherford is made, Weatherford is entitled to judgment over and against Hexion for indemnity and/or contribution for any and all sums for which Weatherford may be adjudged liable.

(Doc. 33, at 2 (emphases and footnote added).)  In response to Hexion's motion for summary judgment, Weatherford further explained that (1) it seeks "contribution from Hexion should Weatherford be found negligent for having chosen and/or used SiberProp based upon its reliance on Hexion in having made that choice;" and (2) it seeks "indemnity from Hexion as the designer, manufacturer, and seller" of the SiberProp should it be found liable on the product liability claim. (Resp. to Mot. for Summ. J. 8.)[2]  Therefore, the Court construes Weatherford's Third-Party

---

[1] This product is called SiberProp.

[2] This explanation is consistent with Weatherford's discovery responses to Hexion:

Complaint as seeking: (1) contribution, if Weatherford is found liable for negligence; and (2) common-law indemnity, if Weatherford is found liable under a product liability theory. Hexion seeks summary judgment on both claims. In the summary judgment briefing before the Court, all parties cited and relied upon Texas law. Therefore, the Court has applied Texas law in deciding these motions.

### A. Contribution

Weatherford seeks contribution for Crest's negligence claim under Texas' statutory scheme governing "proportionate responsibility" among joint tortfeasors. TEX. CIV. PRAC. & REM. CODE ANN. § 33.001-33.017 (Vernon 2008);[3] *see also Cressman Tubular Prods. Corp. v. Kurt Wiseman Oil & Gas, Ltd.*, 322 S.W.3d 453, 459-60 (Tex. App. 2010) (explaining that proportionate responsibility statute generally applies to claims sounding in tort but not claims sounding in contract). The statutory scheme provides "a right of contribution" among those found jointly and severally liable to a plaintiff for the same harm. CIV. PRAC. & REM. § 33.015(b) ("As among themselves, each of the defendants who is jointly and severally liable under Section 33.013 is liable for the

---

> Weatherford's contention is that [Crest] is alleging that the SiberProp did not set up like it was supposed to. To the extent that is a claim by Plaintiff that the SiberProp is defective, then it is a claim Hexion, as the product designer, manufacturer, and seller, should answer to. To the extent Plaintiff's claim is that SiberProp was an inappropriate product for use in the subject application, Weatherford further contends that Hexion was informed about the application and advised Weatherford that SiberProp was appropriate for use.

(Ex. 1 to Hexion's Mot. for Summ. J.)

[3] In its response brief, Weatherford cited this statutory scheme as the basis for its contribution claim. (*See* Weatherford's Resp. to Mot for Summ. J. 7 (relying on TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(a).)

damages recoverable by the claimant under Section 33.012 in proportion to his respective percentage of responsibility.").[4]

In this case, Crest did not sue Hexion directly. Nor did any defendant seek to designate Hexion as a "responsible third party." *See* CIV. PRAC. & REM. § 33.004(a) ("A defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party."); *In re Arthur Andersen LLP*, 121 S.W.3d 471, 482 n.33 (Tex. App. 2003) (explaining three-part test for such designation). Therefore, Hexion is deemed a "contribution defendant" under the statutory scheme. *Id.* § 33.016(a) ("In this section, 'contribution defendant' means any defendant, counterdefendant, or third-party defendant from whom any party seeks contribution with respect to any portion of damages for which that party may be liable, but from whom the claimant seeks no relief at the time of submission."); *see also In re Arthur Andersen LLP*, 121 S.W.3d at 482 n.33 (explaining differences between "responsible third parties" and "contribution defendants" under statutory scheme).

Claims against contribution defendants are governed by the following statute:

(b) Each liable defendant is entitled to contribution from each person who is not a settling person and who is liable to the claimant for a percentage of responsibility but from whom the claimant seeks no relief at the time of submission. A party may assert this contribution right against any such person as a contribution defendant in the claimant's action.

(c) The trier of fact shall determine as a separate issue or finding of fact the percentage of responsibility with respect to each contribution defendant and these findings shall be solely for purposes of this section and Section 33.015 and not as a

---

[4] The concept of "contribution" under Texas law is in accord with the Restatement (Second) of Torts, which provides that a right of contribution exists "when two or more persons become liable in tort to the same person for the same harm," and when one tortfeasor has "discharged the entire claim for the harm by paying more than his equitable share of the common liability." Restatement (Second) of Torts § 886A.

part of the percentages of responsibility determined under Section 33.003. Only the percentage of responsibility of each defendant and contribution defendant shall be included in this determination.

(d) As among liable defendants, including each defendant who is jointly and severally liable under Section 33.013, each contribution defendant's percentage of responsibility is to be included for all purposes of Section 33.015. The amount to be contributed by each contribution defendant pursuant to Section 33.015 shall be in proportion to his respective percentage of responsibility relative to the sum of percentages of responsibility of all liable defendants and liable contribution defendants.

CIV. PRAC. & REM. § 33.016.  In accordance with § 33.016(c), "[t]he jury determines the percentage of responsibility of a 'contribution defendant' separately for purposes of contribution to the defendants, and not as part of the global apportionment of responsibility." *In re Arthur Andersen LLP*, 121 S.W.3d at 482 n.33.[5]

As with contribution among jointly liable defendants named by the plaintiff in the original action, a defendant's right to seek contribution from a "contribution defendant" is "derivative" of the plaintiff's right to recover from the contribution defendant. *See Shoemake v. Fogel, Ltd.*, 826 S.W.2d

---

[5] The "global apportionment of responsibility" refers to a jury's original apportionment of liability among four statutorily defined groups:

(a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, *for the following persons* with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:
(1) each claimant;
(2) each defendant;
(3) each settling person; and
(4) each responsible third party who has been designated under Section 33.004.

CIV. PRAC. & REM. § 33.003 (emphasis added).

5

933, 935 (Tex. 1992). ("A defendant's claim of contribution is derivative of the plaintiff's right to recover from the joint defendant against whom contribution is sought."); *Willis v. Bay N. Homeowners Ass'n, Inc.*, No. 03-04-00453-CV, 2005 WL 1845663, at *4 (Tex. App. Aug. 3, 2005) (extending this principle to claim against "contribution defendant"). Thus, a contribution defendant is not liable unless the plaintiff "could have brought a direct claim" against it. *See id.* at *6 (analyzing whether the plaintiffs could have brought a direct claim against the contribution defendant or whether such claim was legally barred due to lack of duty).

For purposes of summary judgment, the following facts are either undisputed or construed in the light most favorable to Weatherford. In March 2009, Hexion sold Weatherford 390,000 pounds of SiberProp for use on the Morris 2 frac job. At the time of sale, Hexion published a "Technical Data Sheet" ("TDS") for SiberProp, which stated that the "suitable applications" for SiberProp were "[a]t closure stress of 500 to 8000 psi." (Ex. 2 to Weatherford's Resp. to Mot. for Summ. J.) A Weatherford employee who selected or assisted in selecting SiberProp, Paul Newman ("Newman"), believed that the anticipated "closure stress" for the relevant frac job was "roughly 1300 psi," within the range provided on the TDS. (Newman Aff. ¶ 7, Ex. 1 to Weatherford's Supp. Br.) Approximately one month after the frac job, Hexion changed the TDS for SiberProp to state that its "suitable applications" were "[a]t closure stress of 2,000 to 8,000 psi," such that the anticipated 1300 psi would fall below the range in the revised TDS. (Ex. 4 to Weatherford's Resp. to Mot. for Summ. J.) According to Newman, he would not have selected or recommended SiberProp for the frac job under the new specifications set forth in the revised TDS. (Newman Aff. ¶ 11.) Hexion has not offered any explanation for this alteration.

Weatherford asserts that "if Weatherford is determined to have been negligent in choosing, recommending, getting approved, and using SiberProp in the first place, then Hexion should likewise bear its share of that liability in contribution." (Weatherford's Supp. Br. 2.) More specifically, Weatherford argues:

> Hexion changed the closure stress values in the technical data sheet a month after the subject frac job for a reason related to the properties and performance of the product, that Hexion intended and knew the data in the technical data sheet would be relied upon, and that inaccurate data could have detrimental consequences. Hexion's position that Weatherford is not entitled to contribution because Hexion disclaimed certain warranties is without merit.[6] While the language relied upon by Hexion disclaims certain legally imposed warranties, the provision itself states that excepted from such disclaimer is that "the product shall conform to contracted specifications." *The closure stress is one of the contracted specifications* and if it is determined that the SiberProp "didn't set up like it was supposed to" and that Weatherford was negligent for having chosen SiberProp in the first place, then Weatherford will be entitled to contribution from Hexion based upon Mr. Newman's detrimental reliance on the specifications in the technical data sheet.

(*Id.* 4 (emphasis and footnote added).)

---

[6] The disclaimer on the relevant Technical Data Sheet provides:

DISCLAIMER
The information provided herein was believed by [Hexion] to be true and accurate at the time of preparation or prepared from sources believed to be reliable, but it is the responsibility of the user to investigate and understand other pertinent sources of information, to comply with all laws and procedures applicable to the safe handling and use of the product and to determine the suitability of the product for its intended use. [HEXION] MAKES NO WARRANTY, EXPRESS OR IMPLIED, CONCERNING ANY PRODUCT OR THE MERCHANTABILITY OF FITNESS THEREOF FOR ANY PURPOSE OR CONCERNING THE ACCURACY OF ANY INFORMATION PROVIDED BY HEXION, except that the product shall conform to contracted specifications, and that the product does not infringe any valid United States patent.

(Ex. 2 to Weatherford's Resp. to Mot. for Summ. J.)

The question before the Court is whether *Crest has any viable tort claim against Hexion*, such that Hexion should be considered jointly and severally liable for Crest's damages.[7] Based on Weatherford's characterization of its theory of Hexion's liability to Crest, the Court concludes that: (1) the theory of liability asserted by Weatherford is premised upon express warranty, *i.e.*, a "contracted specification," regarding the suitable closure stress range; and (2) claims for breach of express warranty sound in contract and therefore do not create a right of contribution under Texas' statutory scheme.

First, to avoid the "Disclaimer" on the TDS, Weatherford couched its claim as one related to a "contracted specification" – namely, the suitable closure stress range listed on the TDS. Weatherford cites a subsequent change in this particular aspect of the TDS as potential evidence that the original range was inaccurate. Assuming for purposes of summary judgment that this theory of relief against Hexion somehow falls outside the disclaimer, it still fails because it cannot be construed as "negligence" flowing from Hexion to Crest or as any other tort flowing from Hexion to Crest. Instead, it must be construed as breach of contract and/or breach of an express warranty set forth on the TDS regarding the suitable closure stress range. *See Conquest Drilling Fluids, Inc. v. Tri-Flo Intern., Inc.*, 137 S.W.3d 299, 310 (Tex. App. 2004) (affirming grant of summary judgment where negligence and negligent misrepresentation claims "were in substance contract claims relabeled as torts").[8]

---

[7] Weatherford focuses on its own "detrimental reliance" on the TDS, but the relevant question is whether there is tort liability flowing from Hexion to Crest.

[8] It appears that Crest, even if not in privity with Hexion, could assert a breach of express warranty claim, subject to any disclaimers entered into by Weatherford and Hexion. *See Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 729 (Tex. App. 2006) ("If a third party can sue a seller for breach of express warranty, as we must assume for this appeal, the seller's

Second, express-warranty claims sound in contract and are therefore excluded from Texas' proportionate-responsibility statute. *Cressman Tubular Products Corp.*, 322 S.W.2d at 460 (citing *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 57 (Tex. 2008)). In *Cressman*, the Texas Court of Appeals rejected the argument that "breach of an express warranty sounds in tort when the breach causes damage to or loss of use of property other than the property that is the subject of the contract." *Id. Cressman* involved facts similar to those presented here – namely, damages to the plaintiff's oil well following a fracture stimulation job, some of which were allegedly caused by defective tubing string used during the job. The *Cressman* court found that the trial court properly disregarded any proportionate-responsibility finding in connection with the tubing string distributor's breach of an express warranty. *See id.* at 460.

During the pretrial conference, the Court permitted Weatherford to present additional arguments to persuade the Court that Hexion had potential tort liability *to Crest* and/or to distinguish *Cressman*. However, the Court remains unpersuaded that Hexion may be deemed a joint tortfeasor with Weatherford, as counsel for Weatherford did not articulate any plausible theory of tort liability. As explained above, and in the Court's prior Order, Weatherford's primary argument in response to Hexion's motion has always been premised upon the "contracted specification" in the TDS regarding the suitable closure stress range (and not upon conversations between Weatherford employees and Hexion employees regarding bottom hole temperatures). (*See* Weatherford's Resp. to Mot. for Summ. J. 6-7 (discounting relevance or importance of discussions between Hexion employees and Weatherford employees regarding bottom hole temperature, which had been the focus of Hexion's

---

disclaimers of warranties apply to the third party.").

motion for summary judgment, and arguing that any such discussions were "immaterial and irrelevant") (arguing that "[o]f greater relevance is the issue of the closure pressure range [set forth on the TDS]"); Weatherford's Supp. Br. in Support of Resp. to Mot. for Summ. J. (focusing exclusively upon written representation regarding suitable closure stress range and attaching affidavit regarding Weatherford's reliance on such representation).) In addition, Weatherford did not dispute Hexion's asserted facts regarding the "bottom hole temperature" conversations between Weatherford and Hexion and instead sought to avoid summary judgment based on its "additional undisputed facts." (*See* Weatherford's Resp. to Mot. for Summ. J. 4-6.) For the same reasons discussed above and in the Court's prior Order, this theory of liability is either precluded by the disclaimer or sounds in contract. In either case, it cannot render Hexion liable for contribution.

During the pretrial conference, counsel for Weatherford emphasized that the Court's Order failed to address discussions between Hexion and Weatherford regarding whether an activator is required at certain bottom hole temperatures, which was as an additional basis for its contribution claim. The Court did not address these facts because Weatherford itself indicated that such facts were not pertinent to its contribution claim. Nonetheless, based on Weatherford's oral argument, the Court will now address what it previously deemed to be a confessed argument. The following facts, asserted in Hexion's motion for summary judgment, are undisputed by Weatherford. Matt Cohee ("Cohee") is the only Weatherford employee who spoke with Hexion representatives prior to Weatherford's selection of SiberProp. Cohee spoke to a Hexion sales representative and a Hexion technical specialist by phone. Cohee had a question about "activator," a substance used in conjunction with resin coated proppants that acts as a catalyst to help the proppant particles bond together. In a hypothetical question, Cohee inquired as to whether SiberProp required activator at

a bottom hole temperature of 180 degrees, and the Hexion representative answered that it did not. This was the only representation a Hexion representative made to Cohee. According to Crest's expert, the actual bottom hole temperature was approximately 140 degrees.

This evidence regarding Cohee's conversations with Hexion employees about the bottom hole temperature is also not sufficient to render Hexion liable for contribution under Texas law. First, Hexion played no role in Weatherford's selection of SiberProp, other than publishing the TDS and answering one question regarding the use of activator. At the time of sale, Hexion's employees had no knowledge of how the SiberProp would be used and cannot be deemed to have made any recommendation, negligent or otherwise, as to SiberProp's suitability for this particular frac job. Second, Hexion's verbal answers were entirely consistent with the TDS, which provided that SiberProp requires a activator only at temperatures less than 110 degrees. Whether the temperature at the well was 180 degrees as expected or the actual 140 degrees, activator still would not have been required under the TDS. As argued by Weatherford in its own response brief, "such a discussion [regarding bottom hole temperature] is immaterial and irrelevant in that 140 degrees is still within the recommended temperature range for the use of SiberProp according to Hexion's own materials on which Weatherford relied." (Weatherford's Resp. to Mot. for Summ. J. 6.) Finally, upon careful review of all three experts' reports, which are attached as Exhibits 12, 15, and 16 to Hexion's motion for summary judgment, there are no allegations or evidence that Weatherford's failure to use an activator contributed to Crest's injuries in this case, such that Hexion's representations regarding bottom hole temperature could have played some role in causing Crest's injuries.

In sum, Weatherford has failed to present evidence that Hexion should be liable for contribution, as that term is used under Texas law, in the event a jury assesses damages against

Weatherford on Crest's negligence claim. Weatherford's theory of liability premised upon the TDS is essentially that Hexion provided inaccurate information regarding the suitable closure stress range, thereby contributing to Crest's damages to the well. This potential claim flowing from Crest to Hexion does not sound in tort under Texas law. Weatherford's theory of liability premised upon Hexion employees' representations regarding the need for activator are simply irrelevant and lack any causal link to Crest's injuries.

### B.    Indemnity

Weatherford seeks common-law indemnity from Hexion in the event it is found liable on Crest's product liability claim. In contrast to contribution, which shifts only a proportionate share of loss from one tortfeasor to another, indemnity generally "shifts the entire loss from one tortfeasor to another." Restatement (Second) of Torts § 886A, cmt. l. Contribution and indemnity are "mutually exclusive remedies" because "when there is a right of indemnity, it controls, and neither tortfeasor has a right of contribution against the other." *Id.* Under Texas common law, "a person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to full indemnity from the other for expenditures properly made to discharge the liability." *Humana Hosp. Corp. v. Am. Med. Sys., Inc.*, 785 S.W.2d 144, 145 (Tex. 1990).

In the parties' Proposed Pretrial Order, Crest continues to assert a product liability claim against Weatherford based on the theory that the SiberProp was defective.[9] Hexion moves for summary judgment on the indemnity claim on grounds that the SiberProp was not defective as a

---

[9] Hexion and Weatherford's prior arguments regarding this claim being moot or abandoned by Crest need not be addressed.

matter of law. In its response, Weatherford agrees that Crest does not have sufficient evidence to maintain a product liability claim regarding SiberProp. Crest did not respond to Hexion's motion for summary judgment or refute Hexion's evidence. In the interest of adjudicating Crest's product liability claim based on its merits rather than based on a confessed motion, the Court ordered Crest to be prepared, at the pretrial conference, to discuss and explain its evidence in support of this claim. At the conference, Crest could not adequately explain its product liability theory to the Court and certainly did not outline evidence it could present if given the opportunity to refute Hexion's evidence.

One element of a product liability claim under Texas law is that the product was defective when it left the hands of the manufacturer. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Hexion has presented the following unrefuted evidence regarding the product liability claim. Hexion retained a sample of the SiberProp sold to Weatherford for use on the well. Hexion's performance testing showed that the product was not defective in any manner. Crest's President, Hudgens, is not aware of any evidence that the SiberProp was defective. None of the three expert witnesses that will testify in this case have opined that the problems at the well were caused by any product defect in the SiberProp. (*See* Hexion's Mot. for Summ J. at Exs. 12, 15, 16.) Therefore, the Court concludes that Hexion is entitled to summary judgment on Weatherford's indemnity claim based on the lack of any product defect. For the same reasons, the Court *sua sponte* grants summary judgment in favor of Weatherford on Crest's product liability claim.[10]

---

[10] It is unclear why Weatherford did not also seek summary judgment on this claim. However, based on Crest's lack of evidence, the Court will not permit this claim to reach a jury, and Weatherford will reap the benefit of Hexion's well-supported and unrefuted motion for summary judgment.

**III.     Hudgens' Testimony**

Crest has not designated Hudgens as an expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), and Hudgens is therefore a lay witness. As a lay witness, Hudgens may only offer opinions that are: (a) rationally based on his perception; (b) helpful to clearly understanding his testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. However, Defendants anticipate that Hudgens will attempt to offer opinion testimony at trial that is based upon his scientific, technical, or other specialized knowledge as an engineer, and Defendants seek a pre-trial ruling from the Court as to whether Hudgens may offer any expert opinion testimony at trial. The Court construes such requests as motions, brought pursuant to Federal Rule of Civil Procedure 37(c)(1), to exclude any expert opinions by Hudgens.

As a general rule, failure to designate a non-retained witness as an expert pursuant to Rule 26(a)(2)(A) precludes a party from presenting such expert testimony at trial. *See* Fed. R. Civ. P. 37(c)(1). There is an exception, however, if the non-disclosure was "substantially justified or is harmless." *See id.* The Tenth Circuit has articulated the following four factors to be considered in determining whether a non-disclosure is justified or harmless: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir.1999).

First, the Court concludes that Crest failed to (1) timely identify Hudgens as an expert witness as required by Rule 26(a)(2)(A), and (2) list the subjects of his expert testimony as required by Rule

26(a)(2)(C).[11] These failures were not, as a general matter, substantially justified or harmless. Crest was well aware that certain of Hudgens' opinions could be based upon scientific and specialized knowledge Hudgens acquired by virtue of his engineering expertise. Crest has offered no reasonable explanation for its failures to comply with the federal rules, and Defendants would be severely prejudiced if the Court gave Hudgens free range to offer expert opinions at trial. Thus, as a general matter, Hudgens will not be permitted to offer expert opinion testimony to the jury and will be limited to lay witness opinions.[12]

However, the Court concludes that Crest's disclosure violations were harmless as to any expert opinions elicited by Defendants' counsel during Hudgens' depositions on October 10, 2010 and November 12, 2012. During the October 10, 2010 deposition, for example, opposing counsel asked Hudgens for his "professional opinion" and for his "opinion" in a few instances. (*See, e.g.*, Hudgens Dep. Oct. 20, 2010, at 79-80, 91, 125-27.)[13] With respect to any opinions that are actually "expert" opinions but that were elicited by Defendants' counsel, the Court finds: (1) Defendants will

---

[11] Because Hudgens would potentially be presenting testimony as a non-retained expert, he was not required to provide an expert report. *See* Fed. R. Civ. P. 26(a)(2)(B).

[12] The Court offers the following guidance as to the difference between lay opinion and expert opinion. *See* Fed. R. Evid. 701 advisory committee's note (explaining that "the distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field") (internal quotation omitted); *see also DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. Appx. 378, 381 (2d Cir. 2012) (striking proferred testimony of lay witness engineer who supervised investigation and remedial activities at the site in question because such testimony "could not have been based on the reasoning processes familiar to the average person in everyday life, since ordinary lay persons would have no knowledge of the conditions under which chemical contamination of soil can migrate from site to site"). The Court expects Crest's counsel to endeavor to follow these rules in questioning Hudgens, except to the limited extent he will be permitted to offer expert opinions as set forth below.

[13] This list is not intended to be exhaustive.

not suffer any surprise or prejudice if they are admitted; (2) any prejudice has been cured by the deposition questioning; and (3) introducing the testimony will not disrupt the trial in any manner. *See Woodworker's Supply, Inc.*, 170 F.3d at 993. Thus, assuming the proper expert foundation can be laid, Hudgens shall be permitted to offer any "expert" opinions that were previously elicited and provided during his depositions.

## IV.     Conclusion

Third-Party Defendant Hexion Specialty Chemical's Motion for Summary Judgment Against Third-Party Plaintiff Weatherford International, Inc. (Doc. 113) is GRANTED in its entirety. The Court *sua sponte* grants judgment to Weatherford on the product liability claim asserted against it. Defendants' motions to exclude expert testimony of Hudgens are GRANTED, except as to any expert opinions elicited by Defendants' counsel during Hudgens' depositions.

The remaining claims proceeding to trial against Blocker are breach of contract and negligence. The remaining claim proceeding to trial against Weatherford is negligence. All claims are governed by Texas law, and the jury will be instructed on Texas law.[14] There are no third-party claims proceeding to trial. The parties are ordered to submit a revised proposed pretrial order consistent with this Order no later than ten days following entry of this Order.

SO ORDERED this 19th day of March, 2014.

*Terence Kern*

**TERENCE KERN**
**United States District Judge**

---

[14] Despite the parties' frequent citations to the Oklahoma Uniform Jury Instructions in their proposed jury instructions, the parties appear to agree that Texas law governs all substantive claims. During the pretrial conference, Crest's counsel made a vague reference to Oklahoma law perhaps applying to certain issues. This is the first time any such argument has been made, and it is untimely. Further, Crest has not offered any substantive briefing on choice of law questions and has given every indication that Texas law governs.